Not For Publication

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |  |  |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 08-30245 (LMW) |
|  | ) |  |  |
| GREGORY MITCHELL and SHARON MITCHELL, | ) | CHAPTER | 7 |
|  | ) |  |  |
| DEBTORS. | ) |  |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

|  |  |  |  |
|---|---|---|---|
| HARRIET STUTEY, | ) | ADV. PRO. NO. | 08-3136 |
|  | ) |  |  |
| PLAINTIFF | ) | ECF NO. | 1 |
|  | ) |  |  |
| vs. | ) |  |  |
|  | ) |  |  |
| GREGORY MITCHELL, | ) |  |  |
|  | ) |  |  |
| DEFENDANT. | ) |  |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## APPEARANCES

Ellery E. Plotkin, Esq.                          Attorney for Plaintiff
Law Offices of Ellery E. Plotkin, LLC
777 Summer Street, 2nd Floor
Stamford, CT 06901

Francis E. Lamboley, Esq.                        Attorney for Defendant
The Lamboley Law Firm
2827 Old Dixwell Avenue
Hamden, CT 06518

## MEMORANDUM OF PARTIAL DECISION

Lorraine Murphy Weil, Chief United States Bankruptcy Judge

The matter before the court is the complaint (ECF No. 1, the "Complaint")[1] of the above-referenced plaintiff (the "Plaintiff") seeking a determination that a certain alleged debt owing to her from the above-referenced defendant (the "Debtor") is not discharged in this chapter 7 bankruptcy case pursuant to 11 U.S.C. §§ 523(a)(2) and 523(a)(6). This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334 and that certain order dated September 21, 1984 of the District Court (Daly, J.).[2] This memorandum constitutes the findings of fact and conclusions of law required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.    PROCEDURAL BACKGROUND

### A.    The Chapter 7 Case

On January 25, 2008, the Debtor and his spouse commenced the instant bankruptcy case by the filing of a chapter 7 petition. (*See* Case ECF No. 1.) The bankruptcy schedules (ECF Nos. 29, 99, collectively the "Schedules") contain the following relevant statements: as of the petition date (a) the Debtor scheduled several real property including 20 Waverly Street, New Haven, Connecticut (the "Waverly Street Property") with a stated value of $170,000.00 (subject to secured claims of $162,916.85), 33-35 Weybosset Street, New Haven, Connecticut (the "Weybosset Street Property") with a stated value of $250,000.00 (subject to secured claims of $248,307.90) and three properties located in Memphis, Tennessee (*see* Case ECF No. 29 (Schedule A - Real Property)); (b) the Debtor and his wife owned personal property with a stated value of $81,941.90 including several bank

---

[1]    References herein to the docket of this chapter 7 case appear in the following form: "Case ECF No. __." References herein to the docket of this adversary proceeding appear in the following form: "ECF No. __."

[2]    That order referred to the "Bankruptcy Judges for this District" "all cases under Title 11, U.S.C., and all proceedings arising under Title 11, U.S.C., or arising in or related to a case under Title 11, U.S.C. . . . . "

accounts at People's Bank, Webster Bank and Bank of America with minimal balances (*see id.* (Schedule B - Personal Property)); (c) there were secured claims in the amount of $591,205.46 (*see id.* (Schedule D - Creditors Holding Secured Claims)); (d) there were unsecured priority claims in the amount of $1,504.62 (*see id.* (Schedule E - Creditors Holding Unsecured Priority Claims)); (e) there were unsecured nonpriority claims in the aggregate amount of $847,298.74[3] including: (i) an undisputed claim held by the Plaintiff for a "loan" of $65,689.53 (the "Initial Payment") and (ii) a disputed claim held by the Plaintiff of $600,000.00 (*see id.* (Schedule F - Creditors Holding Unsecured Nonpriority Claims)); (f) there were unexpired leases in the form of rental agreements on each of the properties listed on Schedule A (*see id.* (Schedule G - Executory Contracts and Unexpired Leases)); (g) the Debtor was employed for twelve years as an operation specialist at Prudential Financial and earned a net monthly income of $3,550.71 in addition to $5,725.00 in monthly rental income for a total monthly income of $9,275.71 (*see id.* (Schedule I - Current Income of Individual Debtor(s)));[4] and (h) Schedule J (Current Expenditures of Individual Debtor(s)) lists monthly expenses of $16,004.00 (*see id.*).

The first meeting of creditors of the Debtor was held on February 26, 2008 (and was continued to March 18, 2008). (*See* Case Docket.) The bar date for filing complaints objecting to discharge or for a determination of dischargeability originally was set for April 28, 2008. (*See* Case ECF No. 3.) However, from time to time that date was extended on separate motions filed by the

---

[3]     The figure of $847,298.74 includes $29,000.00 added by Amended Schedule F (*see* ECF No. 99).

[4]     Schedule I also list an income tax refund to the Debtor of $960.25. The Debtor's spouse earns a monthly net pay of $2,952.25 (*see id.*). Schedule I, therefore, schedules combined net monthly income for the Debtor and his wife of $13,188.21.

Plaintiff and the chapter 7 trustee (the "Trustee"). (*See, e.g.,* Case ECF Nos. 151 (Trustee), 148 (Plaintiff).) On June 20, 2008, the Trustee reported possible asset recovery (*see* Case ECF No. 77) and a bar date of September 25, 2008 was set for the filing of proofs of claim (*see* Case ECF No. 80). On September 25, 2008, the Plaintiff filed a proof of claim for "money loaned" with respect to the Initial Payment. (*See* Claims Register (Claim No. 12-1).) On the same date, the Plaintiff filed another proof of claim for "breach of contract" in the amount of $600,000.00. (*See id*. (Claim No. 13-1).) No objection to either proof of claim has been filed. On January 19, 2009, the Trustee filed that certain Notice of Trustee's Intent To Abandon Property (*see* Case ECF No. 161, the "Notice").[5] No objection to the Notice was filed and the abandonment became effective. On March 20, 2009, the Debtor (and his wife) received their chapter 7 discharges. (*See* Case ECF No. 177.)

On January 19, 2010, the Trustee commenced A.P. No. 10-3009 against the Debtor's mother and sister pursuant to 11 U.S.C. §§ 547 and 548.[6] In that adversary proceeding, the Trustee alleged that on or about June 19, 2007, the Debtor sold property located in Tennessee for a gross purchase price of $167,500.00 and realized net proceeds of $40,703.33. (*See* A.P. 10-3009 ECF No. 1 ¶¶ 10-11.) The Trustee further alleged that within one year of this bankruptcy filing, the Debtor paid all or part of that sum to his mother and/or sister. (*Id*. at ¶¶ 12-13.) On March 24, 2010, an Order Granting Motion for Default (*see* A.P. 10-3009 ECF No. 13) entered upon the Trustee's motion. On March 8, 2011, the Trustee filed that certain Motion for Entry of Judgment on Default. (*See id*. ECF

---

[5]     The Notice proposed to abandon all the properties listed in Schedule A. (*See* Schedules; Notice.) The court notes that orders granting relief from stay in respect of each of those properties entered. (*See* Case ECF Nos. 49, 48, 73, 164 and 191.)

[6]     By order (*see* Case ECF No. 94) dated July 22, 2008, the court approved Ellery E. Plotkin, Esq.'s employment as special counsel to the Trustee. As noted above, Mr. Plotkin also represents the Plaintiff herein.

No. 26.)  A judgment in favor of the Trustee entered on April 25, 2011 for the total amount of $27,500.00.

B.    **The Adversary Proceeding**

On December 26, 2008, the Plaintiff filed the Complaint (*see* ECF No. 1) which commenced this adversary proceeding. The Complaint is stated in three counts and seeks a determination that the subject debt is nondischargeable: (a) under Bankruptcy Code § 523(a)(2); (b) under Bankruptcy Code § 523(a)(4) ("Count Two"); and (c) under Bankruptcy Code § 523(a)(6).  The Debtor filed that certain Answer (ECF No. 8) on March 16, 2009 generally denying the allegations of the Complaint. On June 12, 2009, the Plaintiff filed that certain Withdrawal of Count Two of Complaint (*see* ECF No. 29).

Trial ("Trial") in this matter was held over three days, June 15, 2009, June 17, 2009 and July 16, 2009.[7]  Both the Plaintiff and the Debtor submitted documentary evidence into the record (all of which were admitted in full upon agreement).  The following witnesses were called by the Plaintiff: Francoise Levinson (a real estate agent for the Debtor); Donna Castronovo, Esq. (a real estate attorney for the Debtor); George Rozsa (a certified public account and property developer).  The Debtor was called as a witness for the Plaintiff.  The Plaintiff testified on her own behalf.  The Debtor was the sole witness for the defense.  The matter was taken under advisement at the conclusion of the Trial subject to post-trial briefing which were filed (*see* ECF Nos. 38, 42, 43).

---

[7]    Copies of the transcripts of those dates are in the record as ECF Nos. 31 (June 17, 2009 and shall be cited in the following form: "Tr. 1 at ___"), 33 (June 15, 2009 and shall be cited in the following form: "Tr. 2 at ___") and 34 (July 16, 2009 and shall be cited in the following form: "Tr. 3 at ___").  The full transcript in respect of ECF No. 31 mistakenly was docketed in the bankruptcy case as Case ECF No. 180.  Reference herein to trial exhibits of the respective parties appear in the following form: "Plaintiff Exh." or "Debtor Exh.," as the case may be.

Subsequently, the court issued that certain Order for Further Briefing (ECF No. 44) in respect of the adversary proceeding. Such briefs have been filed (*see* ECF No. 46, 47) and the matter now is ripe for disposition.

## II.    FACTS

### A.    General Background

#### 1.    The Parties

The Plaintiff is a single, divorced mother of four adult children. (*See* Tr. 2 at 202 (testimony of the Plaintiff).) At the time of Trial, she was 63 years old. In or about 1986, the Plaintiff and her then-husband purchased property located at 2 Buckingham Avenue, Greenwich, Connecticut (the "Property"). (*See id.* at 114 (testimony of the Plaintiff).) The Property is a ten-room ranch house. (*See* Plaintiff's Exh. R.) She became the sole owner of the Property after the dissolution of the marriage (*see* Tr. 2 at 114 (testimony of the Plaintiff)). She testified that she was last employed in August, 2001 and that her current income is from social security. (*See id.* at 115 (testimony of the Plaintiff).)

The Debtor has a bachelor of science degree in business management from Albertus Magnus College and works for Prudential Financial in its IT department as an operations support specialist (*see* Tr. 1 at 4; Tr. 3 at 8-9 (testimony of the Debtor)). He has been so employed for over 13 years (*see* Tr. 3 at 8 (testimony of the Debtor)). Prior to that job, the Debtor worked at American Skandia as a help desk support manager and prior to that at GE Capital in Stamford (*see* Tr. 1 at 6 (testimony of the Debtor)). The Debtor sued GE Capital *pro se* on the basis of wrongful termination (*see* Tr. 1

at 6-7 (testimony of the Debtor)).[8]   The suit was settled and a confidentiality agreement was imposed

as part of the settlement (*see id.* at 7 (testimony of the Debtor)).   Prior to GE Capital, the Debtor

worked at Air Express International ("Air Express") in Darien, Connecticut in about 1990 or 1991

(*see* Tr. 1 at 7; Tr. 3 at 9 (testimony of the Debtor)).   The Plaintiff and the Debtor met at Air Express.

The parties met at a company picnic at Air Express in Darien, Connecticut.   At that time, the

Debtor taught tennis and agreed to teach the Plaintiff's children.   The Debtor taught the Plaintiff's

children tennis for about a year.   (*See* Tr. 2 at 117 (testimony of the Plaintiff).)   In or about 1994, the

Plaintiff left Air Express and went to GE Capital in Stamford as a computer consultant.

Subsequently, the Plaintiff helped the Debtor secure the job at GE Capital because he was not happy

at Air Express.   (*See id.* at 118 (testimony of the Plaintiff).)   The Plaintiff left GE Capital in 1996.

(*See id.* at 121 (testimony of the Plaintiff).)

The Debtor had purchased other real estate for investment purposes in Connecticut and

Tennessee (*see* Tr. 1 at 7-8 (testimony of the Debtor)).   He testified that "on the side I would buy and

sell properties - - as a passion, as a hobby." (Tr. 3 at 10:5-7 (testimony of the Debtor).)   His first

investment property was the house in which he grew up in Tennessee (*see* Tr. 1 at 22 (testimony of

the Debtor)).   He then purchased nine or ten investment properties over the next several years, and

of those, about five in Connecticut. (*See id*. at 8 (testimony of the Debtor).)   Some of his properties

were sold (some at a profit) and others were leased as rental properties from which he earned rental

income.   (*See* Tr. 1 at 8-9 (testimony of the Debtor).)

---

[8]        The Plaintiff testified that at the time of the Debtor's termination from GE, he had
called her several times to ask her for money to pay a lawyer.   (*See* Tr. 2 at 121 (testimony of the
Plaintiff).)   She testified that she told him that she did not have any money to lend him.   (*See id*.)

The Debtor maintained bank accounts at Bank of America, People's Bank and Webster for his investment properties (*see* Tr. 1 at 11 (testimony of the Debtor)).  He stated that the Bank of America account basically was his and his wife's joint account.  The other two accounts were primarily used to make mortgage payments and to pay for renovations to the investment properties.[9] The People's Bank account was used for the investment properties in Connecticut.  (*See id.* at 40 (testimony of the Debtor).)  The Debtor did not have a separate bank account for each property.  (*See* Tr. 1 at 12 (testimony of the Debtor).)  He stated that he did not see the need to maintain a separate account because he was not in a partnership and was not accountable to anyone but himself.  (*See* Tr. 3 at 28 (testimony of the Debtor).)  Furthermore, he stated that he could determine by looking at his bank statements (*see, e.g.,* Plaintiff's Exhs. I (People's Bank), O (People's Bank), DD (Webster Bank)) which entries pertained to the Property because he ran the project.  (*See* Tr. 1 at 38 (testimony of the Debtor).)  If no money was in the People's Bank or Webster accounts, the Debtor stated that he "would have to bring money out of my Bank of America account." (Tr. 1 at 12:19-20 (testimony of the Debtor).)

## 2.    **Financial Problems of the Plaintiff and Attempts to Resolve Them**

Several years went by without any contact between the parties and then, in or about March 2003, the Plaintiff started a nutrition company and called the Debtor to see if he wanted to get involved with the product.  (*See* Tr. 2 at 120 (testimony of the Plaintiff).)  Subsequently, the Plaintiff told the Debtor that she was having financial problems.  (*See* Tr. 2 at 120 (testimony of the Plaintiff); *see also* Tr. 3 at 9:21-23 (testimony of the Debtor) (The Plaintiff stated that "she had run out of

---

[9]       The Debtor testified that although his wife had signatory power on the People's Bank and Webster Bank accounts, she did not write checks against those accounts.  (*See* Tr. 1 at 14 (testimony of the Debtor).)

- 8 -

money and she was . . . in trouble, financially.").)  The Debtor recalls that the Plaintiff was living

in the Property without any electricity (*see id.* at 16 (testimony of the Debtor)).  Consequently, in the

spring of 2003, the Debtor had the lights at the Property turned on in his name "to help her out." (Tr.

1 at16:18 (testimony of the Debtor).)  At that time, the Debtor testified that the Plaintiff told him that

she was losing the Property through foreclosure. (*See id.* at 17 (testimony of the Debtor).)[10]

        In or about 2003, the Plaintiff also told Mr. Rozsa that she was unemployed and having

financial difficulties.  (*See* Tr. 2 at 72 (testimony of Mr. Rozsa).)  Mr. Rozsa stated that the Plaintiff

told him that she was considering renting or selling the Property (*see id.* (testimony of Mr. Rozsa))

and would move to Florida (*see* Tr. 2 at 87 (testimony of Mr. Rozsa)).  According to Mr. Rozsa, he

attempted to get a temporary mortgage based on the Plaintiff's credit and went to his clients[11] to see

if any of them would give her a private mortgage but when he described the condition of the

Property, no one was interested. (*See id.* at 73 (testimony of Mr. Rozsa).)  Mr. Rozsa testified that

he also tried to refinance the Property but was unable to do so due to the state of the Plaintiff's

finances.  (*See id.* 2 at 74 (testimony of Mr. Rozsa).)

        Mr. Rozsa also tried to secure a co-venture between the Plaintiff and one or more of his

clients. (*See* Tr. 2 at 73 (testimony of Mr. Rozsa).)  Through a co-venture, he proposed getting an

---

[10]        However, the Plaintiff testified that in the summer of 2003, she borrowed $25,000.00 from a cousin and used that money to become current on the mortgage in respect of the Property. (*See* Tr. 2 at 124 (testimony of the Plaintiff).)

[11]        In addition to being a certified public accountant and a property developer, Mr. Rozsa testified that he had several other occupations.  (*See* Tr. 2 at 70 (testimony of Mr. Rozsa).)  He stated that, at the time of trial, he had fourteen different businesses ranging from property development, mortgage company, tax planning and estate planning.  (*Id*.)  He testified that he met the Plaintiff in or about the mid-1990s with respect to tax issues and did her tax returns for several years up to about 1999.  (*See id.* at 71 (testimony of Mr. Rozsa).)

investor to purchase the Property for $900,000.00, which investor would get a preferred return of the

first 12% of whatever was invested into the Property and the parties would then split the profits of

any sale. (*See* Tr. 2 at 107-108 (testimony of Mr. Rozsa).)  Mr. Rozsa testified that he believed

renovations to the Property would cost $250,000.00 to $300,000.00 and he thought six months was

a reasonable time to complete renovations. (*See id.* at 78, 79 (testimony of Mr. Rozsa).)  He also

stated that he expected the renovated Property would sell for between $1,800,000.00 and

$2,200,000.00. (*See id.* at 109 (testimony of Mr. Rozsa).)  In fact, Mr. Rozsa testified that he was

able to find an investor who agreed to purchase the Property for $900,000.00 and an agreement was

drawn up.  Ultimately, the Plaintiff rejected the offer. (*See id.* at 110 (testimony of Mr. Rozsa).)

The Plaintiff testified that a real estate agent, Connie Jones, came to the Property periodically

to ascertain whether the Plaintiff was interested in listing the Property for sale. (*See* Tr. 2 at 122

(testimony of the Plaintiff).)  She signed listings with Ms. Jones but could not remember when those

were done. (*See* Tr. 2 at 123 (testimony of the Plaintiff).)  According to the Plaintiff, Ms. Jones

instructed her to clean up the Property and all of the clutter and Ms. Jones would be able to rent the

Property for about $5,500.00 per month. (*See id.* at 124 (testimony of the Plaintiff).)  Through Ms.

Jones, the Plaintiff testified that she received offers to purchase the Property (including two offers

for $1,000,000.00 and $1,300,000.00). (*See* Tr. 2 at 127 (testimony of the Plaintiff).)  With respect

to the $1,300,000.00 offer, the Plaintiff stated that the offer consisted of a payment of $800,000.00

and a mortgage note for $500,000.00 (*see id.* at 193 (testimony of the Plaintiff)).  The Plaintiff

testified that because of a dispute regarding the broker's commission, that deal fell apart.  (*See id.* at 193 (testimony of the Plaintiff).)[12]

### 3.    The Condition of the Property

At Trial, the witnesses testified that the Property was in need of substantial repair.  Ms. Levinson testified that due to vegetation everywhere, it was hard to identify a set yard to the Property.  (*See* Tr. 2 at 10 (testimony of Ms. Levinson).)  Mr. Rozsa testified that the Property was extremely cluttered and the outside of the Property needed substantial care such as landscaping, repairing the front entrance and refinishing the steps.  (*See* Tr. 2 at 74 (testimony of Mr. Rozsa); *see also id.* at 10 (testimony of Ms. Levinson).)  The Property also needed a paint job, inside and out (*see* Tr. 2 at 10 (testimony of Ms. Levinson); *id.* at 75 (testimony of Mr. Rozsa)) and new floors (*see* Tr. 2 at 25 (testimony of Ms. Levinson); *id.* at 74 (testimony of Mr. Rozsa)). Mr. Rozsa stated further that the kitchen had to be redone and the master bedroom had major problems.  (*See* Tr. 2 at 74 (testimony of Mr. Rozsa).)  One of the two heating systems in the house was nonfunctional.  (*See* Tr. 2 at 27 (testimony of Ms. Levinson); Tr. 2 at 75 (testimony of Mr. Rozsa).)  The rear deck to the Property was in need of substantial repair.  (*See* Tr. 2 at 75 (testimony of Mr. Rozsa); Tr. 2 at 24 (testimony of Ms. Levinson).)  Further, Mr. Rozsa testified that the air handler on the side of the house was unstable and windows were in poor condition.  (*See* Tr. 2 at 75-76 (testimony of Mr. Rozsa).)  The Property also had termite damage and/or carpenter ants. (*See id.* at 75 (testimony of Mr. Rozsa).)

---

[12]    Ms. Levinson testified that she also made an offer to the Plaintiff to purchase the Property for $800,000.00 which was not accepted.  (*See* Tr. 2 at 12 (testimony of Ms. Levinson).)

The Plaintiff testified that the "roof was my nightmare." (*See* Tr. 2 at 125 (testimony of the Plaintiff).)  Mr. Rozsa testified that the roof needed a full replacement.  (*See* Tr. 2 at 75-76 (testimony of Mr. Rozsa).)  The Debtor agreed that the roof was not in good condition and had to be "reworked a couple of times."  (Tr. 1 at 60:1-2 (testimony of the Debtor).)  Ms. Levinson stated that she would grade the condition of the Property between a three and a four on a scale of one to ten.  (*See* Tr. 2 at 10 (testimony of Ms. Levinson).)  For that reason, Ms. Levinson considered the Property a "handyman special." (*See* Tr. 2 at 44 (testimony of Ms. Levinson).)

**B.**      **The Transfer of the Property to the Debtor**

In or about Spring 2004, the Debtor and the Plaintiff discussed the possibility of the Debtor's purchasing the Property. (*See* Tr. 3 at 10 (testimony of the Debtor).)   The parties had several discussions regarding the terms of purchasing the Property in person and over the phone (*see* Tr. 1 at 22-23 (testimony of the Debtor)).[13]  The Plaintiff testified that the Debtor told her that he had

---

[13]      The Plaintiff testified to her reasons for choosing to sell the Property to the Debtor:

[H]e was on vacation in Las Vegas. He kept calling me when I told him I wasn't going to sell the house to him any longer and I thought real hard about that.  He kept calling me up begging me to give him a chance to see what he could really do to fix up the place and make money for me.
. . .
Since 2003, when he heard that I was in trouble, he said he loved my kids, he taught them tennis, he loved my kids, he knew how hard I worked for the house, how many hours I - - everything I did was for the house and putting money into the house, all the overtime I worked.  And he said he wanted to save the house for me and the kids and he didn't want anything out of it.
. . .
I thought since he won his settlement at GE, and I thought since I had helped him get the job, and he got a settlement, he's buying and selling houses, I thought that he was really a friend.  And . . . that he was sincere and that he knew what he was doing.
. . .
And I wasn't happy with . . . [Mr. Rozsa's] deal . . . . I figured if I call [sic] Greg, if he wants it, to come back in the picture, that I would get more money by selling it to

expertise in the buying and selling of houses. (*See* Tr. 2 at 122 (testimony of the Plaintiff).)  During

this time, the parties discussed renting the Property but because the Property was in "sad shape"

(Tr. 1 at 23:23 (testimony of the Debtor)), some renovation was necessary (*see* Tr. 1 at 24 (testimony

of the Debtor)).  The Debtor testified that he had renovated properties before but "they weren't in

th[e] type of condition" as the Property.  (*Id.* at 24:19-20 (testimony of the Debtor).)[14]

### 1.   The Sale to the Debtor

On November 29, 2004, the Plaintiff sold the Property to the Debtor for $750,000.00.  (*See*

Plaintiff's Exhs. C, E; *see also* Tr. 2 at 138 (testimony of the Plaintiff).)[15]  At the time of the sale,

the house was appraised at $1,420,000.00.  (*See* Plaintiff's Exh. H; *see also* Tr. 2 at 140 (testimony

of the Plaintiff); Tr. 1 at 27 (testimony of the Debtor).)[16]  The Debtor testified that he and his wife

took the Property as tenants in common.[17]  Mr. Rozsa testified that he and the Plaintiff came up with

---

Greg.

(Tr. 2 at 134:23– 136:19 (testimony of the Plaintiff).)

[14]     At about this time, the Plaintiff testified that she commenced a bankruptcy case to stop a foreclosure action against the Property.  (*See* Tr. 2 at 128 (testimony of the Plaintiff).) Judicial notice of the court's records indicate that the Plaintiff commenced a chapter 13 bankruptcy case on August 12, 2004 and that on September 23, 2004, an order entered dismissing that bankruptcy case upon the court's motion.  The case was closed on October 6, 2004.

[15]     The house was to be sold at a foreclosure sale one week later (*see* Tr. 2 at 196 (testimony of the Plaintiff)).  At the time the Property was sold to the Debtor, the Plaintiff had already moved to Florida.

[16]     The Plaintiff testified that she believed an appraisal was done at that time to obtain a mortgage with respect to the Property (*see* Tr. 2 at 141 (testimony of the Plaintiff)).

[17]     The Debtor testified that his wife was listed on the title of some of the investment properties for "credit purposes" but otherwise she had no involvement in the properties.  (*See* Tr. 1 at 13 (testimony of the Debtor).)  The Debtor was able to obtain mortgages on his wife's credit. Further, his wife was not to be a purchaser of the Property (*see* Tr. 1 at 30 (testimony of the Debtor)).

- 13 -

a sale price of $750,000.00 to cover the mortgage payoff amount (including any late charges or fees associated with the mortgage) and to give some money to the Plaintiff.  (*See* Tr. 2 at 87 (testimony of Mr. Rozsa); Tr. 2 at 217 (testimony of the Plaintiff).)  The Debtor testified that the sale figure also covered the costs and fees associated with the sale (*see* Tr. 3 at 18 (testimony of the Debtor)).

To purchase the Property, the Debtor and his wife took out: a first mortgage (*see* Exh. F, the "First Mortgage") on the Property for $562,500.00 and a second mortgage (*see* Exh. G, together with the First Mortgage, the "Mortgages") on the Property of $186,303.81.[18]  (*See also* Plaintiff's Exh. C.)  Consequently, the total mortgage proceeds were $748,803.81, almost the entire amount of the purchase price and almost 100% financing.[19]  (*See* Tr. 1 at 29; Tr. 3 at 12 (testimony of the Debtor).)  The closing costs to the Debtor were $26,266.74 (*see* Plaintiff's Exh. C, line 103) but he received a $22,500.00 closing cost credit (*see id.*, lines 207 and 507).  The Debtor testified that he paid $5,847.14 (*see* Plaintiff's Exh. C, line 303) with respect to the sale and the fact that most of his closing costs were paid by the Plaintiff was because that was "the way the deal was structured." (*See* Tr. 1 at 30:10-11 (testimony of the Debtor); *see also* Tr. 3 at 20 (testimony of the Debtor).)

With the First Financing, taxes and insurance payments were paid separately from mortgage payments.  (*See* Tr. 1 at 47, 48 (testimony of the Debtor).)  Consequently, from December 2004 through April 2005 when the Second Financing (as defined below) occurred, the Debtor claims to

---

However, they learned close to the closing that the Debtor's wife had to be on the mortgage (*see* Tr. 1 at 31 (testimony of the Debtor)).  (*See also* Plaintiff's Exh. E (wife's name is handwritten into the mortgage).)

[18]     The Plaintiff testified that the Debtor was supposed to come up with $50,000.00 for the purchase of the Property but he did not (*see* Tr. 2 at 149 (testimony of the Plaintiff)).

[19]     The court hereafter will refer to that financing as the "First Financing."

- 14 -

have paid the taxes and insurance himself.  (*See* Tr. 1 at 48 (testimony of the Debtor).)  He testified

that he was unsure of the amount of taxes he claims to have paid.

### 2.   The Agreement and the Profit Share Arrangement

In conjunction with the sale of the Property, the Debtor and the Plaintiff entered into an

agreement (*see* Plaintiff's Exh. A, the "Agreement"). The Debtor testified that the Agreement was

prepared by the Plaintiff and her attorney. (*See* Tr. 3 at 13 (testimony of the Debtor).)  Paragraph 1

provided for the Debtor to purchase the Property in "fee simple."  (*See* Agreement.)  Paragraph 2 of

the Agreement provided for the Debtor to repair and/or improve the Property at his "complete and

unfettered discretion."  (*See id.* ¶ 2; Tr. 2 at 143 (testimony of the Plaintiff).)  Paragraph 3 of the

Agreement gave the Plaintiff the option (the "Purchase Option") to buy back the Property with 30

days notice to the Debtor and the Plaintiff was to "close within 15 days of exercising said option,

time being of the essence."  (Agreement ¶ 3; Tr. 2 at 144, 207 (testimony of the Plaintiff).)

Paragraph 4 of the Agreement provided that if the Debtor executed a broker's listing agreement to

sell the Property, the Purchase Option terminated (*see* Agreement ¶ 4; Tr. 2 at 208 (testimony of the

Plaintiff)).

Paragraph 5 ("Paragraph 5") of the Agreement gave the Debtor the "absolute right" to market

and sell the Property.  (*See* Agreement ¶ 5; Tr. 2 at 209 (testimony of the Plaintiff).)  Paragraph 5

also provided for the Plaintiff to "reimburse[]" the Debtor from "net closing proceeds" for expenses

incurred in "purchasing, carrying and repairing" the Property plus an additional fee (the "Premium")

equal to 20% of the reimbursable costs and expenses.[20]  (*See* Agreement ¶ 5; Tr. 1 at 119 (testimony

---

[20]     The Plaintiff testified that it was her idea to give the Debtor the additional 20%
because (among other things) he was being a friend.  (*See* Tr. 2 at 147 (testimony of the Plaintiff).)

- 15 -

of the Debtor).)  Paragraph 5 further provided that, after "reimburse[ment]" and payment of the

Premium,  the Plaintiff was entitled to the next $600,000.00[21] with any remaining funds to be split

80% to the Plaintiff and 20% to the Debtor (*see* Agreement; Tr. 2 at 146 (testimony of the Plaintiff)

(the "Profit Sharing Arrangement")).  Paragraph 6 of the Agreement provided that the Debtor would

not further encumber the Property (after the Mortgages) without the agreement of the Plaintiff.[22]

Finally, the Agreement provided that it should not be filed on the land record and that the Agreement

would terminate and become null and void (*see* Agreement; Tr. 2 at 151 (testimony of the Plaintiff)).

The Debtor testified that he did not believe that the Agreement established a partnership with the

Plaintiff (*see* Tr. 3 at 16 (testimony of the Debtor)).[23]  He believed that under the Agreement, he

could have retained the Property indefinitely or he could have moved into the Property or rented it

and retained that income (*see id.* at 17 (testimony of the Debtor)).

    The Plaintiff testified that the Debtor told her that he would have the renovations done within

six months.  (*See* Tr. 2 at 159 (testimony of the Plaintiff).)  The Debtor testified that the parties never

discussed a time frame for the completion of renovations.  (*See* Tr. 1 at 24 (testimony of the

---

[21]    The Plaintiff testified that because Mr. Rozsa had stated that once renovated, the
Property would sell for between $1,800,000.00 and $2,200,000.00 she "was expecting to make more
than $600,000 profit in my pocket." (Tr. 2 at 196:17-18 (testimony of the Plaintiff).)

[22]    The Plaintiff testified that she did not want the Debtor to be able to put any further
liens on the Property.  (*See* Tr. 2 at 150 (testimony of the Plaintiff).)  She stated that she knew that
the Debtor was buying and selling other houses and she did not want him to use the Property to fix
up his other houses.  (*See id.* at 151 (testimony of the Plaintiff).)  She stated that if the equity would
be taken from the Property, it should be used to fix up the Property.  Furthermore, she noted that her
profit from the Property would come from any equity after a sale.  (*See id.* at 151 (testimony of the
Plaintiff).)

[23]    The court notes that the Debtor testified to the contrary elsewhere in the proceeding.
(*See* Tr. 1 at 34:9-11 (The Plaintiff "has been a partner in the [renovation] project and getting it up
and running.").)

- 16 -

Debtor).)  He testified that the Agreement permitted him to do the work at his discretion.  (*See* Tr. 1 at 22 (testimony of the Debtor).)  The Debtor believed that the Plaintiff got the six month time frame from Mr. Rozsa.  (*See id.* at 24 (testimony of the Debtor).)  While it is possible that the Plaintiff may have heard of the six month time frame from Mr. Rozsa, the court is more persuaded by the Plaintiff's testimony that the Debtor himself set that time frame for the renovation project.

### 3.     The Plaintiff Transfers the Initial Payment to the Debtor

From the closing, the Plaintiff received a check for $65,671.53 (*see* Plaintiff's Exh. D) from her attorney (*see* Tr. 1 at 32 (testimony of the Debtor)).  The Plaintiff signed that check over to the Debtor.  (*See* Tr. 2 at 153 (testimony of the Plaintiff; Tr. 1 at 34 (testimony of the Debtor).)  On November 30, 2004 (one day after the closing), the Debtor deposited those funds into his People's Bank account.[24]  According to the Plaintiff, that money was to be used to renovate the Property and was to be repaid to her.  (*See* Tr. 2 at 162-63 (testimony of the Plaintiff).) The Plaintiff testified that the Agreement did not obligate her to pay the Debtor that money (*see id.* at 144 (testimony of the Plaintiff)).

The Debtor testified that he did not regard the Initial Payment given to him by the Plaintiff as a loan because: "We actually never talked about it specifically, how it was going to start the project, but she did agree and had been a partner in the project and getting it up and running.  So after the closing, she signed the check over to me to start the process." (Tr. 1 at 34:7-12 (testimony of the Debtor).)  Despite the foregoing testimony, the Debtor listed the Initial Payment in the Schedules

---

[24]     That amount is reflected in the Debtor's People's Bank statement on December 8, 2004 (*see* Plaintiff's Exh. I ("check deposit" of $65,671.53)).  There appears to be no dispute, however, that the amount sought to be deemed nondischargeable is $65,698.53.  (*See* Schedules (Schedule F); Claims Register (Claim 12-1).)

as a "loan" from the Plaintiff (*see* Plaintiff's Exh. FF). The Debtor testified that the Initial Payment

was used towards the renovation of the Property. (*See* Tr. 1 at 42 (testimony of the Debtor).)

### C. Debtor Obtains Additional Funds To Renovate the Property

#### 1. The Second Financing

The Debtor testified that in 2005, he ran out of money and needed money to continue the

renovations on the Property. He therefore decided to refinance (the "Second Financing") the

Property. On or about April 26, 2005, the Debtor (and his wife) took out a mortgage for $750,000.00

against the Property (*see* Plaintiff's Exh. M, the "Countrywide First Mortgage"). The Debtor

testified that funds from that mortgage paid off the Mortgages. (*See* Tr. 1 at 41 (testimony of the

Debtor).) On that same day, the Debtor (and his wife) took out a second mortgage for $149,000.00

against the Property (*see* Plaintiff's Exh. N, the "Countrywide Second Mortgage" together with the

Countrywide First Mortgage, the "Countrywide Mortgages"). The Debtor testified that because a

prepayment penalty was assessed by the lender, he received net proceeds from the Countrywide

Second Mortgage of about $100,000.00. (*See* Tr. 1 at 46 (testimony of the Debtor).)[25] He testified

that those proceeds were deposited in either the People's or the Webster bank account. (*See id.* at

46-47 (testimony of the Debtor).) The Debtor was not able to locate the relevant bank statement.

---

[25]     In his post-trial brief, counsel for the Debtor claimed that the Debtor received
$118,000.00 after the prepayment penalty. (*See* ECF No. 42 at 6.) However, that (unlike the
Debtor's testimony) is not evidence. Moreover, the Debtor was unable to identify a prepayment
penalty provision in the Mortgage documents. (*See* Tr. 3 at 85-86 (testimony of the Debtor).) The
court is not persuaded that the Debtor received reduced proceeds from the Countrywide Second
Mortgage and finds that the Debtor appropriated $49,000.00 therefrom for purposes unrelated to the
Property.

(*See id.* at 47 (testimony of the Debtor).)[26]  He further testified that 100% of that $100,000.00 was

used to repair the Property (*see* Tr. 1 at 42, 123 (testimony of the Debtor)) and was used to make

mortgage, taxes and insurance payments (*see* Tr. 1 at 47 (testimony of the Debtor)).  Through the

Second Financing, the insurance and tax payments were escrowed with the mortgage company.  (*See*

Tr. 1 at 47- 48 (testimony of the Debtor).)

The Plaintiff testified that she learned of the fact of the Second Financing a few days before

the Trial.  (*See* Tr. 2 at 170 (testimony of the Plaintiff).)  She stated that she recalled having a

conversation with the Debtor about refinancing the Property and that she gave her consent.  (*See* Tr.

2 at 209–210 (testimony of the Plaintiff).)  However, she could not recall when the conversation took

place and assumed it was prior to the Second Financing in light of paragraph 6 of the Agreement.

(*See id.* at 171 (testimony of the Plaintiff).)  She testified that she had no idea how much funds were

obtained by the Second Financing until the Trial.  (*See* Tr. 2 at 172 (testimony of the Plaintiff).)

## 2.    Additional Efforts To Obtain Funds

In addition to the Second Financing, the Debtor utilized other means to fund the project at

the Property.  On or about April 29, 2005, the Debtor refinanced the Waverly Street Property.  He

received a disbursement of $12,697.70 (*see* Debtor's Exh. 3) and claims to have used about 25% (or

$3,175.00) of those funds on the Property.  (*See* Tr. 3 at 30 (testimony of the Debtor).)  On or about

October 10, 2005, the Debtor sold property located at 95 Fairfax Street, West Haven, Connecticut

for a gross sale price of $299,900.00.  (*See* Plaintiff's Exh. L.)  From that sale, he received

$87,958.25 (*see id.*) and claims to have used about $14,000.00 of those funds on the Property (*see*

---

[26]    The Debtor testified that he lost "a whole box or load of files and invoices" in a move
to a new residence.  (*See* Tr. 1 at 43:2-3 (testimony of the Debtor).)

Tr. 3 at 32 (testimony of the Debtor)).  On or about March 16, 2006, the Debtor borrowed

$13,500.00 from Patriot, LLC ("Patriot") but received only $10,000.00[27] (the "Patriot Loan") and

secured those funds by granting Patriot a second mortgage against the Weybosset Street Property.

(*See* Debtor Exh. 1.)  The Debtor claims that 100% of those funds went towards his renovation

project at the Property.  (*See* Tr. 1 at 122; Tr. 3 at 33 (testimony of the Debtor).)  On or about March

31, 2006, the Debtor refinanced 93 Grand Street, New Haven, Connecticut (his primary residence

at the time) for $324,000.00 and received net proceeds of $314,258.71.  (*See* Debtor's Exh. 4.)  From

those funds, he paid off a $286,900.00 mortgage on that property (*see* Debtor's Exh. 2) and netted

approximately $28,000.00.  The Debtor claims that he used 75% (or about $21,000.00) of those

funds on the Property.  (*See* Tr. 3 at 35 (testimony of the Debtor).)  On or about July 31, 2006, the

Debtor obtained $31,000.00 from Jacqueline Polverari (the "Polverari Loan")[28] and secured those

funds by granting Ms. Polverari a second mortgage against the Waverly Street Property.  (*See*

Debtor's Exh. 5.)  On or about April 3, 2007, Ms. Polverari placed a lien on the Property for

$36,000.00.  (*See* Plaintiff's Exh. W (Lien Certificate).)[29]  The Debtor claims that 65% (or

---

[27]        The discrepancy was not explained.

[28]        The Debtor testified that Ms. Polverari was in the real estate business and was a friend
of a friend. (*See* Tr. 3 at 36 (testimony of the Debtor).)  The Debtor also stated that he actually
borrowed $28,000.00, not $31,000.00.  Again, that discrepancy was not explained.

[29]        With regard to that lien certificate, Attorney Castronovo testified that she was
uncertain if the underlying lien was valid under Connecticut law.  (*See* Tr. 2 at 62 (testimony of
Attorney Castronovo).)  She stated that there was no court order associated with the lien so it was
not a judicial lien.  Further, there was no mortgage and the lien certificate was not signed by the
Debtor (or his wife) (*see id.* at 62 (testimony of Attorney Castronovo)). The Debtor testified that he
did not know that Ms. Polverari had filed the lien certificate on the land record and that she did not
tell him that she had done so. (*See* Tr. 1 at 95 (testimony of the Debtor).)  He found out about the lien
certificate at the 2007 closing of the sale of the Property (*see* Tr. 3 at 55 (testimony of the Debtor)).
The Debtor did not know why the lien certificate was filed in April 2007, prior to the end of the 12-

$20,000.00) of the Polverari Loan was used to renovate the Property.  (*See* Tr. 1 at 122; Tr. 3 at 37

(testimony of the Debtor).)  On or about September 13, 2006, the Debtor obtained a second loan

from Patriot for $19,000.00 and secured those funds by granting Patriot a "second mortgage" against

the Property.  (*See* Plaintiff's Exh. V, the "Patriot Mortgage.")  The Debtor did not seek the

Plaintiff's permission nor inform her before further encumbering the Property.  (*See* Tr. 2 at 177

(testimony of the Plaintiff).)  The Debtor claims that 100% of the Patriot Mortgage funds went into

renovating the Property.  (*See* Tr. 1 at 122; Tr. 3 at 39 (testimony of the Debtor).)

The Plaintiff testified that she was not aware that the Debtor was borrowing money from

other properties to fund the renovation of the Property.  (*See* Tr. 2 at 174 (testimony of the Plaintiff).)

She also was not aware that Ms. Polverari had placed a "lien" on the Property (*see id.* at 176

(testimony of the Plaintiff)).  Conversely, the Debtor testified that he had permission from the

Plaintiff to place the Patriot Mortgage on the Property.  (*See* Tr. 1 at 117 (testimony of the Debtor).)

He stated that in 2005 or 2006 the Plaintiff had made a "blanket statement to do whatever I had to

do to keep the project going, because I called her to see if she had any money." (Tr. 1 at 117:11-13

(testimony of the Debtor).)  He testified that he told the Plaintiff that he might have to go to a "hard

money lender" (Tr. 1 at 117:15 (testimony of the Debtor).)  The Debtor stated that the Plaintiff told

him "to do what I need to do to keep the project going." (*See* Tr. 1 at 117:21-22 (testimony of the

Debtor); *see also* Tr. 3 at 38 (testimony of the Debtor).)  However, the Debtor then denied that the

Plaintiff gave him a "blank check" in respect of the Property.  (*See* Tr. 1 at 118 (testimony of the

Debtor).)  He also denied that she gave him a "blank check" against the equity in the Property (*see*

---

month repayment period.  He further testified that he did not speak to Ms. Polverari about the lien
certificate and did not tell the Plaintiff about it.  (*See* Tr. 1 at 97 (testimony of the Debtor).)

*id.*).  He claims that he had to refinance and sell his properties to keep the project going.  (*See* Tr. 3 at 40 (testimony of the Debtor).)  The Debtor testified that throughout the 2 ½ years that he had possession the Property, he kept the Plaintiff informed as to the work that was being done, the above loan transactions and the fact that he was having financial difficulties.  (*See* Tr. 3 at 40, 59-60 (testimony of the Debtor).)  Due in part to the Debtor's inconsistent testimony, the court is persuaded that the Debtor did not seek the Plaintiff's agreement prior to encumbering the Property with the Patriot Mortgage as he was required to do pursuant to the Agreement.

### D.  Renovations to the Property and Expenses Incurred by the Debtor

#### 1.  Work Done at the Property

With respect to what he did at the Property in 2005, the Debtor testified that he:  did demo work in the kitchen and bathrooms; brought in long dumpsters (about five or six) to clean out the trash; updated the bathrooms with granite countertops; put in new tile floors, new bathtubs, new sinks and new toilets; replaced the roof; put new carpet in the downstairs family room; did excessive plumbing work; replaced the back deck; and cleared trees and vegetation from the Property.  (*See* Tr. 1 at 75-77 (testimony of the Debtor).)  With respect to work done at the Property in 2006, the Debtor testified that he: replaced the windows and all hardware on the windows; put in new kitchen cabinets; put in a new washer and dryer in the laundry room; removed the floor and put in new ceramic tile floor in the laundry room; painted the entire house inside and out; put sheetrock throughout the house in the ceiling to cover stains (from the roof); and cleared trees and vegetation. (*See id*. at 77-78 (testimony of the Debtor).)  The Debtor testified that he did no work at the Property in 2007 because he had run out of money.  (*See id.* at 78 (testimony of the Debtor).)

The Debtor testified that he also did additional renovations to the Property where he: did some chimney work; replaced two skylights in the roof; repainted each bathroom; rebuilt the center island in kitchen; put in new ceramic tile floor in kitchen; put in new appliances in kitchen; put in new granite countertops in kitchen; sanded and restrained each window in the house; did tile work in the family room upstairs; removed the old glass in the sliding doors in the downstairs family room; removed dead trees that were up against the house; had lawn and snow removal services; and pruned trees back to give the Property a better appearance.  (*See* Tr. 3 at 22-24 (testimony of the Debtor).)  The Debtor testified that he never finished renovating the Property.  (*See* Tr. 1 at 71 (testimony of the Debtor); *see also* Tr. 2 at 211 (testimony of the Plaintiff).)

### 2.    Contractors/Vendors and Billing

The Debtor hired different contractors to do work at the Property as needed.  (*See* Tr. 3 at 24 (testimony of the Debtor).)  Some of those contractors gave the Debtor invoices but he could not locate any of those invoices because he (claims that) he was "missing a whole file cabinet of documents and invoices" from his move to a new residence.  (Tr. 1 at 62:17-18 (testimony of the Debtor).)  The Debtor did not enter into any written contracts with any of the vendors and/or contractors with respect to the renovation of the Property.  (*See id.* at 63 (testimony of the Debtor).)  The Debtor recalled the names of some contractors and their contributions to the project (*see* Plaintiff's Exh. Q):  Paul O (who had a long last name) did the kitchen cabinets; Jim Murphy and Paul O worked on the kitchen floor, family room and hallway;  Vinny (the Debtor was unsure of his last name) updated the three bathrooms; Barry (the Debtor did not know his last name) was the electrician; and Steve (who was also the roofer) and Vinny did the plumbing.  (*See* Tr. 1 at 60-62

- 23 -

(testimony of the Debtor).)  All of the contractors that worked at the Property were paid in cash.  (*See*

Tr. 3 at 75 (testimony of the Debtor).)

### 3.    Debtor's Exhibit Q

At Trial, the Debtor submitted into evidence a journal (Plaintiff's Exh. Q, the

"Journal") maintained by the Debtor wherein he tracked all of his financial responsibilities, whether

personal or business related.  (*See* Tr. 1 at 49 (testimony of the Debtor).)  He testified that he kept

the Journal "to keep up with any and everything that I was doing in life.  [I]t wasn't just for . . . the

Property]; it was for all my properties.  It was for friends and everything else."  (Tr. 3 at 26:21– 27:1

(testimony of the Debtor).)  The Journal contains a page entitled "Greenwich Expenses" which lists

expenses incurred by the Debtor during the renovation the Property.[30]  The "Greenwich Expenses"

are listed as follows:

| | |
|---|---|
| Correll Appraisal | $  3,500.00 |
| Demo Work | $  4,500.00 |
| Electrical | $  3,800.00 |
| Plumbing | $  4,300.00 |
| Sanded/Stain Windows, Doors, Molding | $  8,750.00 |
| Updated Window Hardware | $     800.00 |
| Snow Removal | $  1,450.00 |
| Lawn Service | $  1,250.00 |
| Verizon | $     865.00 |
| Connecticut Natural Gas | $  2,771.00 |
| Connecticut Light and Power | $  1,181.00 |
| ADT | $  2,400.00 |

---

[30]    The Debtor's testimony is inconsistent as to whether that list is exhaustive.  (*See* Tr.
1 at 54 (exhaustive); Tr. 3 at 25-26 (not exhaustive) (testimony of the Debtor).)  For example, the
Debtor testified that insurance payments were made although they were not listed in the Journal.
(*See* Tr. 1 at 55-56 (testimony of the Debtor).)  The court need not address the Debtor's inconsistent
statements and will give no weight to the Debtor's uncorroborated testimony of additional expenses
that were not included in the Journal.

| | |
|---|---|
| Countrywide Mortgage | $146,647.50 [31] |
| Option One Mortgage | |
| Property Taxes | $ 25,357.50 |
| Roof | $ 22,245.00 |
| Kitchen Cabinets | $ 12,763.00 |
| Kitchen Floor, Family Room, Hallway | $  2,625.00 |
| Updated 3 Bathrooms | $  9,899.00 |
| Sheet Rock Ceiling | $  5,450.00 |
| Install Carpet | $    480.00 |
| Painted Completed Inside | $  6,500.00 |
| Painted Completed Outside | $  8,000.00 |
| Dumpsters | $  2,500.00 |
| Replaced Deck | $  9,500.00 |
| Laundry Room Floor | $    975.00 |
| New Kitchen Appliances | $  4,830.00 |
| Expense | $126,025.00 [32] |

According to the Journal, the Debtor paid total monthly mortgage payments of $4,888.25. Over three years, he claimed to have paid a total of $175,977.00 ($4,888.25 x 36 = $179,977.00). However, that amount is overstated. That is because the Debtor testified that he made mortgage payments on the Property from January 2005 through January 2007 or for twenty five months, not "three years" as indicated in the Journal. (*See* Tr. 1 at 58-59 (testimony of the Debtor).) Consequently, the Debtor made mortgage payments in the total amount of $122,206.25 ($4,888.25 x 25 = $122,206.25). Accordingly, pursuant to the Journal, the corrected total expenses claimed by the Debtor is $268,897.75 ($146,691.50 + $122,206.25 = $268,897.75).

---

[31]     This figure is not included in the initial calculation because (as determined below) it is incorrect.

[32]     From the court's calculation, the correct figure (not including the mortgage payments of $146,647.50) is $146,691.50. (*See* Tr. 1 at 85 (testimony of the Debtor).)

### E.    Debtor Faces Additional Money Problems

#### 1.    Debtor Cannot Make Mortgage Payments on Properties

Beginning in the fourth quarter of 2006 and going into 2007, the housing market began to change. (*See* Tr. 3 at 40 (testimony of the Debtor).)  In order to make upcoming mortgage payments on properties (including the Property), the Debtor attempted to refinance but was no longer able to do so. (*See id.* at 41 (testimony of the Debtor).)  Subsequently, he fell behind in mortgage payments on four properties, including the Property and his primary residence.  (*See id.* at 41 (testimony of the Debtor).)   He stated that several tenants moving out of his properties at the same time also contributed to his hardship. (*See id.* at 41 (testimony of the Debtor).)  The Debtor also fell behind on payments on the Polverari and the two Patriot loans.

The Debtor testified that there came a time when he stopped making mortgage payments. (*See* Tr. 1 at 70 (testimony of the Debtor).)  In or about February, 2007, the Debtor called the Plaintiff and told her that he was having trouble paying the mortgage on the Property and asked her for money.  (*See* Tr. 2 at 167-68 (testimony of the Plaintiff).)  The Plaintiff testified that the Debtor called her many times to tell her about financial problems with the Property (*see id.* at 216 (testimony of the Plaintiff)).  In or about March 2007, the Debtor testified that he told the Plaintiff that the Property might go into foreclosure.  (*See* Tr. 3 at 52 (testimony of the Debtor).)   After one of their conversations, the Plaintiff testified that she called Mr. Rozsa.  (*See* Tr. 2 at 214 (testimony of the Plaintiff).)

#### 2.    The Plaintiff Contacts Mr. Rozsa

Mr. Rozsa testified that in late 2006 or early 2007, he received a phone call from the Plaintiff asking him for help because the Debtor was in "trouble." (Tr. 2 at 87:14 (testimony of Mr. Rozsa).)

The Plaintiff asked Mr. Rozsa to check the condition of the Property to see if it could be sold or rented. (*See id.* at 91 (testimony of Mr. Rozsa).)  In 2007, Mr. Rozsa visited the Property and was surprised at the condition of the Property: "curb appeal" still had not been addressed and the front steps to the house were still in dire need of repair; the condenser for the air conditioning unit on the right side of house still had not been repaired/replaced; the roof had been poorly patched and no edge guards were present; the outside of the house may or may not have been painted (if it was, it was poorly done); the windows looked the same; and the back deck had been repaired instead of replaced and was stained in two different colors. (*See* Tr. 2 at 93-95 (testimony of Mr. Rozsa).)  With respect to the interior of the Property, Mr. Rozsa testified: the Debtor did a "beautiful" job on the granite countertop in the kitchen but redid the kitchen to the standard of a Stamford, not a Greenwich home; some walls were fine but some had holes and no patches; the ceiling had holes in it; some parts but not all of the house were painted; and the floors were redone in certain parts but mostly undone (including all of the lower level). (*See* Tr. 2 at 94-95 (testimony of Mr. Rozsa).)

After viewing the Property, Mr. Rozsa told the Plaintiff that, in his opinion, the Property still needed substantial work, that many of the initial conditions were still present and, therefore, they would not be able to get anywhere near the possible price they could have gotten for the Property. (*See* Tr. 2 at 96 (testimony of Mr. Rozsa).)  Mr. Rozsa also discussed the condition of the Property with the Debtor who stated that he had ran out of money. (*See id.* at 97 (testimony of Mr. Rozsa).)  Mr. Rozsa and the Debtor also discussed Mr. Rozsa taking over the project and to see if he could get investors involved to maximize the return on the Property to the Plaintiff. (*See* Tr. 2 at 97-98 (testimony of Mr. Rozsa).)  Mr. Rozsa stated that he visited the Property at least three times in or about March 2007 to discuss that offer with the Debtor.  The Debtor testified that Mr. Rozsa brought

- 27 -

one potential investor with him on one of those visits.  (*See* Tr. 1 at 44 (testimony of the Debtor).)

According to Mr. Rozsa, the Debtor told him that he would think about his offer but Mr. Rozsa could

not recall the Debtor ever getting back to him.  (*See* Tr. 2 at 100 (testimony of Mr. Rozsa).)  The

Debtor testified that Mr. Rozsa stated that he would get back to him and, when Mr. Rozsa did not

call the Debtor, he called Mr. Rozsa.  At that time, the Debtor testified that Mr. Rozsa told him that

he was not interested.  (*See* Tr. 3 at 44-45 (testimony of the Debtor).)  According to Mr. Rozsa, the

Debtor also told him that he had listed the Property with a broker but was not having much success.

(*See* Tr. 2 at 101 (testimony of Mr Rozsa).)

      F.      **The Debtor Sells the Property**

           1.      **The Listing Agreement and the Offer**

Towards the end of 2006, the Debtor met with Ms. Levinson[33] with respect to renting the

Property. (*See* Tr. 1 at 73 (testimony of the Debtor).)  Ms. Levinson testified that at the end of 2006,

she held a broker's open house to determine if the Property was rentable.  (*See* Tr. 2 at 19 (testimony

of Ms. Levinson).)  She testified that at that time, the Debtor had done some work on the floors in

the dining room, the family room and the kitchen, fixed the front step, did the back deck, did some

work on the bathroom, installed a new granite countertop in the kitchen, purchased new appliances

for the kitchen (although they were not connected) and repaired one of the two heating zones in the

house (*see id.* at 26 (testimony of Ms. Levinson)).  Ms. Levinson testified that she determined that

the Property was not rentable at that time.  (*See* Tr. 2 at 30 (testimony of Ms. Levinson).)

---

    [33]    The Plaintiff previously introduced the Debtor to Ms. Levinson.  (*See* Tr. 2 at 20
(testimony of Ms. Levinson).)

On or about February 10, 2007, Ms. Levinson testified that she entered into a listing agreement with the Debtor (and his wife) that was to take effect on or about March 2, 2007. (*See* Debtor's Exh. 10 (the "Listing Agreement); *see also* Tr. 2 at 19 (testimony of Ms. Levinson), Tr. 1 at 72 (testimony of the Debtor).)[34]   The Debtor met with Ms. Levinson several times before the Listing Agreement was signed.  (*See* Tr. 1 at 73 (testimony of the Debtor).)   At the time of the listing, Ms. Levinson testified that she would grade the Property (with the repairs) a six out of ten. (*See* Tr. 2 at 31 (testimony of Ms. Levinson).)   At the request of the Debtor, Ms. Levinson initially listed the Property for $1,595,000.00. (*See* Tr. 2 at 44 (testimony of Ms. Levinson), Plaintiff's Exh. C, Debtor's Exh. 10.)   She testified that from late 2006 to when the Property was sold, the Plaintiff did "nothing major" in respect of repairing the Property.  (*See* Tr. 2 at 30 (testimony of Ms. Levinson).)

Ms. Levinson testified that some time well after listing the Property and during the negotiations for the sale of the Property, she went to review Town Hall records and discovered that the Debtor had stopped paying the mortgage on the Property and that mechanics liens and mortgage liens had attached to the Property.  (*See* Tr. 2 at 39-40 (testimony of Ms. Levinson).)   Further, she testified that she began receiving phone calls from builders.  (*See id.* at 41 (testimony of Ms. Levinson).)  She spoke to the Debtor about the missed mortgage payments and he confirmed that he was behind in payments for a few months.  (*See id.* at 40 (testimony of Ms. Levinson).)   Ms. Levinson stated that, based on information told to her by the Plaintiff, she was aware of the Agreement between the parties.  (*See id.* at 18 (testimony of Ms. Levinson).)   She, however,  never

---

[34]     The Debtor testified that at the time he signed the Listing Agreement he was still discussing a possible offer with Mr. Rozsa.  (*See* Tr. 3 at 46 (testimony of the Debtor).)

saw the Agreement.  (*See id.* at 19 (testimony of Ms. Levinson).)  She was unaware of the Profit

Sharing Arrangement between the Plaintiff and the Debtor upon any sale of the Property.  (*See id.*

at 32 (testimony of Ms. Levinson).)

The Plaintiff recalls that maybe in a conversation she had with the Debtor in February 2007,

he told her that he was going to list the Property for sale.  (*See* Tr. 2 at 182 (testimony of the

Plaintiff).)  The Debtor testified that not only did he tell the Plaintiff that the Property was going on

the market for sale (*see* Tr. 1 at 83 (testimony of the Debtor)) but that she also knew that he had

listed the Property for almost $1,600,000.00 (*see* Tr. 3 at 51 (testimony of the Debtor)).  He testified

that, through the Listing Agreement, he received offers under $1,000,000.00 and had conversations

with the Plaintiff about those offers.  (*See id.* at 52 (testimony of the Debtor).)  Subsequently and

upon the recommendation of Ms. Levinson, the listing price was reduced to $1,395,000.00.  (*See id.*

at 47 (testimony of the Debtor).)  The Debtor then received an offer for $1,225,000.00 (negotiated

up from a lower offer) from Joseph and Patricia Demuyt which he accepted.  The Debtor previously

did not know the purchasers.  (*See id.* at 48 (testimony of the Debtor).)

## 2.    The Debtor's Closing Attorney

In previous closings involving Connecticut properties, the Debtor has used Gabriel Cusanelli,

Esq. as his closing attorney.  (*See* Tr. 1 at 19 (testimony of the Debtor).)  He had used Attorney

Cusanelli for the 2004 closing of the Property.  (*See* Tr. 1 at 19, 81 (testimony of the Debtor).)

Consequently, Attorney Cusanelli had knowledge of the Profit Sharing Arrangement.  Attorney

Cusanelli also  had represented the Debtor in several foreclosure proceedings (*see* Plaintiff's Exhs.

- 30 -

HH, II, KK (court dockets reflecting Attorney Cusanelli's appearances)).[35]  The Debtor testified that

he used another attorney when he purchased 93 Grand Street, West Haven in either 1996 or 1997.

(*See* Tr. 1 at 22 (testimony of the Debtor).)

       Attorney Donna Castronovo testified that she was contacted by the Debtor in June 2007. (*See*

Tr. 2 at 52 (testimony of Attorney Castronovo).)  The Debtor testified that his agent referred three

attorneys in the Greenwich area and he chose Attorney Castronovo.  (*See* Tr. 1 at 78 (testimony of

the Debtor).)  When the Debtor met with her, he already had a buyer for the Property (*see* Tr. 2 at

54 (testimony of Attorney Castronovo)).  Attorney Castronovo testified that at some point, she

became aware that the sale of the Property was a distress sale in light of the pending foreclosure.

(*See* Tr. 2 at 55 (testimony of Attorney Castronovo).)  The Debtor denied not using Attorney

Cusanelli for the closing of the sale of the Property because he knew of the Profit Sharing

Agreement.  (*See* Tr. 1 at 82 (testimony of the Debtor).)  He also denied using Attorney Castronovo

because she had no knowledge of the Profit Sharing Agreement.  (*See id.* (testimony of the Debtor).)

Attorney Castronovo testified that no mention was made to her of a Profit Sharing Arrangement and

that if she had known of such an arrangement, she would not have distributed the net proceeds from

the sale of the Property.  (*See* Tr. 2 at 68 (testimony of Attorney Castronovo).)  She testified that if

she knew that a dispute existed, she would have placed the funds in escrow or in an interest bearing

trustee account until the dispute was resolved. (*See id.*)

---

      [35]     Plaintiff's Exh. HH is the foreclosure docket in respect of the Waverly Street
Property, Plaintiff's Exh. II is the docket in respect of the Weybosset Street Property and Plaintiff's
KK is the docket in respect of the Property.  The Debtor asserted that despite the appearances of Mr.
Cusanelli in those foreclosure proceedings, Mr. Cusanelli was "helping me out" and was not
representing him. (*See* Tr. 1 at 21 (testimony of the Debtor).)  The court finds that distinction
immaterial and finds that Mr. Cusanelli was the Debtor's counsel of record in those foreclosure
proceedings.

### 3.    The Sale and the Distribution of the Sale's Proceeds

On or about July 20, 2007, the Property was sold for $1,225,000.00 (*see* Debtor's Exh. 11).

At the time of the sale, one of the two furnaces still was not fixed (*see* Tr. 2 at 31, 49 (testimony of

Ms. Levinson); *see also* Tr. 1 at 74–75 (testimony of the Debtor))[36] and the air conditioner was not

working (*see* Tr. 2 at 49 (testimony of Ms. Levinson); *see also* Tr. 1 at 75 (testimony of the Debtor)).

The buyer purchased the property "as is." (*See id*. at 75: 5-6 (testimony of the Debtor); *see also* Tr.

2 at 48-49 (testimony of Ms. Levinson).)   Attorney Castronovo prepared the HUD Settlement

Statement in respect of the Property.  (*See* Plaintiff's Exh. U, the "HUD Statement;" *see also* Tr. 2

at 59 (testimony of Attorney Castronovo).)

From the sale proceeds, several loan obligations were paid off.   The Countrywide First

Mortgage was paid off in the amount of $838,785.72 (*see* Plaintiff's Exh. U, line 504; Tr. 3 at 53

(testimony of the Debtor)).   The Countrywide Second Mortgage also was paid off in the amount of

$158,691.28 (*see* Plaintiff's Exh. U, line 508; Tr. 3 at 54 (testimony of the Debtor)).  The Polverari

Loan was paid of in the amount of $34,100.00 (*see* Plaintiff's Exh. U, line 506; Plaintiff's Exh. AA

(payment check)).   As noted, Attorney Castronovo questioned the validity of that lien but made

payment on the loan because the Debtor agreed to the payoff.  (*See* Tr. 2 at 63 (testimony of Attorney

Castronovo).)   The Debtor testified that Attorney Castronovo did not question the payoff of the

Polverari Loan nor question the validity of the lien certificate.  (*See* Tr. 3 at 55 (testimony of the

Debtor).)  He stated that she did not advise him that he did not have to pay that loan. (*See id.* at 56

---

[36]    The Debtor testified that it would cost about $20,000.00 to fix the furnace.  (*See* Tr.
1 at 74 (testimony of the Debtor).)

(testimony of the Debtor).)  The court is persuaded that the Polverari Loan was paid at the request of the Debtor.

The Patriot Mortgage was paid in the amount of $28,485.00 (*see* Plaintiff's Exh. U, line 505;[37] Plaintiff's Exh. Z (payment check)). The Patriot Loan was paid in the amount of $18,540.00 (*see* Plaintiff's Exh. U, line 507; Plaintiff's Exh. Y (payment check)).  With regard to the Patriot payoffs, Attorney Castronovo testified that the Patriot Mortgage appeared to have been the only Patriot debt encumbered by the Property (*see* Tr. 2 at 67 (testimony of Attorney Castronovo)) and the Patriot Loan "may have been a personal loan that the clients requested that . . . [she] pay off." (Tr. 2 at 66:23-25 (testimony of Attorney Castronovo).)  She testified further that "often times as a convenience for clients, . . . [she] will pay off . . . unsecured loans." (Tr. 2 at 66:25 - 67:5 (testimony of Attorney Castronovo).)[38]  The foregoing payoffs totaled $1,078,602.00.  The Debtor testified that all of the foregoing payments were made because Attorney Castronovo advised him that they had to be paid. (*See* Tr. 3 at 56 (testimony of the Debtor).)  As noted, the court is not persuaded by the Debtor's testimony.

---

[37]    The HUD Statement indicated that the Patriot Mortgage was a "second mortgage" on the Property.  (*See id.*)  However, the evidence appears to indicate that the Patriot Mortgage was behind the Countrywide Mortgages.

[38]    The Debtor disputed Attorney Castronovo's foregoing testimony.  He testified that the Patriot Loan was paid off from the sale proceeds (even though it was not secured against the Property) because when he requested the payoff for the Patriot Mortgage, Patriot also sent the payoff for the Patriot Loan (they "piggy-backed" this loan onto the other).  (*See* Tr. 3 at 54 (testimony of the Debtor).)  He testified that his attorney told him that payoff figures had to be paid to close the deal so she paid them off (*see id.* at 55 (testimony of the Debtor)).  He stated that she did not question that this loan was not secured by the property.  The court finds Attorney Castronovo's testimony more persuasive.

In addition to the foregoing payoffs from the sale proceeds, the HUD Statement listed a seller's closing cost credit of $6,125.00. (*See* HUD Statement, lines 214 and 514.) However, the Debtor testified that that amount was not actually the seller's cost but was the buyer's cost. (*See* Tr. 3 at 53 (testimony of the Debtor).) He stated that, based on the agreement of the parties, that amount was credited to the buyers for the cost of repairing the heating system. (*See id.* (testimony of the Debtor).) Further, "settlement charges to seller" of $72,973.29 (*see* HUD Statement, line 502) were expenses incurred by the Debtor in selling the Property which were deducted from the sale proceeds. (*See* Tr. 3 at 56 (testimony of the Debtor).)

From the sale, the Debtor received net sale proceeds of $72,061.40. (*See* HUD Statement, line 603; *see also* Tr. 3 at 56 (testimony of the Debtor).) With those funds, he paid mortgagees to get his other properties out of foreclosure. (*See id.* at 57 (testimony of the Debtor).) He also claims to have used a portion of the net proceeds to pay off outstanding debts to contractors for work done at the Property. (*See id.* (testimony of the Debtor).) It is undisputed that none of the sale proceeds were paid to the Plaintiff.

## G.   Events After Sale of the Property by the Debtor

### 1.   The Demand Letter

By letter (*see* Plaintiff's Exh. BB, the "Demand Letter") dated July 30, 2007, the Plaintiff demanded return of the Property because she got "nervous that he was going to sell the house out from under [her] . . . ." (Tr. 2 at 187:13-14 (testimony of the Plaintiff).) The Demand Letter was filed on the land record by Mr. Rozsa. (*See* Tr. 2 at 188 (testimony of the Plaintiff).) The Plaintiff was not aware at this point that the Property already had been sold (*see id.* at 188 (testimony of the Plaintiff)). The Debtor did not call her when he received the Demand Letter. However, in early

- 34 -

September 2007, she spoke to the Debtor by telephone and he told her that he had already sold the Property. (*See* Tr. 2 at 189 (testimony of the Plaintiff); *see also* Tr. 3 at 59 (testimony of the Debtor).) The Plaintiff stated that when she asked him the sale price, the Debtor quickly ended the conversation and hung up the phone. The Plaintiff stated that she had not spoken to the Debtor since that time. (*See* Tr. 2 at 189 (testimony of the Plaintiff).)

### 2.    The Plaintiff's Knowledge of the Sale

The Plaintiff testified that she never received an accounting of expenditures from the Debtor in respect of the Property. (*See* Tr. 2 at 181 (testimony of the Plaintiff).) The Plaintiff testified that he did not tell her that he had obtained a buyer between June and July of 2007, he did not tell her that a closing date had been set for the sale and he did not tell her the purchase price for the Property. (*See* Tr. 2 at 182 (testimony of the Plaintiff).) Further, the Plaintiff testified that the Debtor did not discuss with the Plaintiff whether she would be receiving funds from the sale. (*See* Tr. 2 at 184 (testimony of the Plaintiff).) The Plaintiff also stated that the Debtor never told her that at about the time of the sale he had other properties in foreclosure. (*See* Tr. 2 at 184 (testimony of the Plaintiff).)

The Debtor agreed that he never furnished the Plaintiff with an accounting. (*See* Tr. 1 at 84 (testimony of the Debtor).) The Debtor testified that he did not send a copy of the sale contract (*see* Debtor's Exh. 11) nor a copy of the Listing Agreement (*see* Debtor's Exh. 10) to the Plaintiff. (*See* Tr. 1 at 83 (testimony of the Debtor).) He testified that he did not tell her that he was signing a contract (*see* Tr. 1 at 83 (testimony of the Debtor)). The Debtor testified that he did not tell the Plaintiff that he would go over an accounting with her after the sale (*see* Tr. 1 at 84 (testimony of the Debtor)).

- 35 -

III.     **ANALYSIS (DISCHARGEABILITY)**

    A.     **Section 523(a)(2)(A)**

        1.     **Applicable Law**

Bankruptcy Code § 523(a)(2)(A) allows the court to make a determination of nondischargeability for "any debt – for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – false pretenses, a false representation, or actual fraud . . . ." 11 U.S.C.A. § 523(a)(2)(A) (West 2011). "Section 523(a)(2)(A) lists three separate grounds for dischargeability: actual fraud, false pretenses, and a false representation." *Deady v. Hanson (In re Hanson),* 432 B.R. 758, 771 (Bankr. N.D. Ill. 2010). Exceptions to discharge must be strictly construed in favor of the debtor in order to effectuate the fresh start policy of bankruptcy. *Rosenblit v. Kron (In re Kron)*, 240 B.R. 164, 165 (Bankr. D. Conn. 1999) (Krechevsky, J.). Furthermore, the "debtor's conduct must involve moral turpitude or intentional wrong; mere negligence, poor business judgment or fraud implied in law (which may exist without imputation of bad faith or immorality) is insufficient." *Id*. at 165-66 (citation and internal quotation marks omitted). The party seeking to establish an exception to the discharge of a debt bears the burden of proof by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279 (1991); *Ramos v. Rivera (In re Rivera),* 217 B.R. 379, 384 (Bankr. D. Conn. 1998) (Dabrowski, J.).

Section 523(a)(2)(A) excepts from discharge a debt for money or an extension, renewal, or refinancing of credit "*to the extent* obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A) (emphasis added). To sustain a claim of nondischargeability under Section 523(a)(2)(A) the plaintiff therefore must make an initial showing that the alleged "fraud . . . existed at the time of, and has been the methodology by which, the money, property or services

were obtained." *Wilcoxon Construction, Inc. v. Woodall (In re Woodall)*, 177 B.R. 517, 523 (Bankr.

D.Md. 1995).

> The Supreme Court has held that § 523(a)(2)(A)'s reference to "actual fraud" was intended to "incorporate the general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular State." *Field v. Mans*, 516 U.S. 59, 71, n. 9, 116 S. Ct. 437, 133 L.Ed.2d 351 (1995). The Second Circuit has construed the meaning of actual fraud to include "a false representation, scienter, reliance, and harm." *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006) (citing Restatement (Second) of Torts § 525). Thus, courts in this circuit have found that "actual fraud" by definition consists of "any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another-something said, done or omitted with the design or perpetrating what is known to be a cheat or deception." *See e.g., In re Lyon*, 348 B.R. 9, 22 (Bankr. D. Conn. 2006).

*McCarron v. Andrews (In re Andrews),* 385 B.R. 496, 508 (Bankr. D. Conn. 2008) (Shiff, J.).

> [B]ecause common law fraud does not always take the form of a misrepresentation, a creditor need not allege misrepresentation and reliance thereon to state a cause of action for actual fraud under § 523(a)(2)(A). Rather, the creditor must establish the following: (1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the subject of the discharge dispute. The fraud exception under § 523(a)(2)(A) does not reach constructive frauds, only actual ones. The existence of fraud may be inferred if the totality of the circumstances presents a picture of deceptive conduct by the debtor that indicates he intended to deceive or cheat the creditor.

*Hanson,* 432 B.R. at 772 (citations omitted).

> False pretenses in the context of § 523(a)(2)(A) include implied misrepresentations or conduct intended to create or foster a false impression. *Mem'l Hosp. v. Sarama (In re Sarama),* 192 B.R. 922, 927 (Bankr.N.D.Ill.1996). [F]alse pretenses [is defined] as follows:

> [A] series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor . . . .

> A false pretense is usually, but not always, the product of multiple events, acts or representations undertaken by a debtor which purposely create a contrived and

- 37 -

misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

*Hanson,* 432 B.R. at 771 (first and second alteration added).

"[A] debtor's silence regarding a material fact can constitute a false representation actionable under section 523(a)(2)(A)." *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1288 (8th Cir. 1987), *abrogated on other grounds by Grogan v. Garner*, 498 U.S. 279 (1991). Further, "[s]ilence or concealment may constitute false pretenses. The failure to disclose must be about material facts and the debtor must have the duty to disclose such facts." *Shelby Shore Drugs, Inc. v. Sielschott (In re Sielschott)*, 332 B.R. 570, 573 (Bankr. C.D. Ill. 2005). *See also Voyatzoglou v. Hambley (In re Hambley)*, 329 B.R. 382, 396 (Bankr. E.D.N.Y. 2005) ("Failure to disclose material facts on which a transaction depends constitutes false pretenses . . . ."). Further, if a debtor has " a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an overt act is not required. Moreover, a misrepresentation need *not* be spoken; it can be made through conduct." *AT&T Universal Card Svs. v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001).

To establish nondischargeability on the basis of "false representation" it must be proved that: (1) the debtor made representations; (2) knowing them to be false; (3) with the intent and purpose of deceiving the creditor; (4) upon which representations the creditor actually and justifiably relied; and (5) which proximately caused the alleged loss or damage sustained by the creditor. *American Express Centurion Bank v. Truong (In re Truong)*, 271 B.R. 738, 744 (Bankr. D. Conn. 2002).

- 38 -

2.      **Application of Law to Fact**

a.      **The Initial Payment**

The court notes that the parties dispute whether the Initial Payment was a loan. The court concludes that a finding in that regard is immaterial because the Plaintiff has failed to carry her burden that those funds were obtained by false pretenses, false representation or actual fraud.

While the Debtor may have represented to the Plaintiff that the project would be completed within six months, no evidence has been submitted that that representation was false at the time it was made or that the Debtor did not have the intent to meet the six month deadline. *See Palmacci v. Umpierrez*, 121 F.3d 781, 787 (1st Cir. 1997) ("If [the debtor] did so intend [to perform] at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made."). Further, "[a]lthough evidence of subsequent conduct may have reflected the debtor's state of mind at the time of the creditor's initial investment, generally subsequent conduct is only properly considered when the conduct is part of an overarching scheme or pattern of misrepresentations." *Palmacci v. Umpierrez*, No. 96-271-M, 1996 WL 773327, at *4 (Sept. 26, 1996), *aff'd*, 121 F.3d 781 (1st Cir. 1997). Here, the Plaintiff has alleged that the Debtor engaged in a pattern of deceit and concealment which resulted in the debt at issue. For the reasons stated above, the court is not persuaded that such a pattern has been proven with respect to the Initial Payment.

Furthermore, the Plaintiff testified that she gave the Initial Payment to the Debtor to apply to the renovations on the Property. The court is not persuaded that the Debtor fraudulently induced the Plaintiff to turn over that money to him. Because nondischargeability is limited to the portion of the debt directly attributable to false pretenses, a false representation, or actual fraud and the court

- 39 -

has determined that no fraud has been proven here with respect to the Initial Payment, the court concludes that any debt in respect of the Initial Payment is discharged pursuant to Section 523(a)(2)(A).

### b.   The Remainder of the Debt

The Plaintiff argues that the Debtor engaged in a pattern of deceit and concealment in the performance of his obligation under the Agreement which continued through to the sale of the Property when he failed to inform the Plaintiff of the sale or to provide her with an accounting of the sale proceeds.

Under Connecticut law, "it is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship . . . .   In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Renaissance Mgmt. Co., Inc. v. Connecticut Housing Fin. Auth.*, 281 Conn. 227, 240 (2007) (internal quotation marks omitted).  *See also Retrofit Partners I, L.P. v. Lucas Indus., Inc.*, 201 F.3d 155, 161 (2d Cir. 2000).

Paragraph 5 delineated clearly the parties' rights in respect of any sale proceeds and how they should be distributed.  While the Debtor had full authority to market and sell the Property, Paragraph 5 imposed on him an implicit obligation to notify the Plaintiff in advance of any sale closing in respect of the Property.  That is so because only upon advance knowledge of a sale closing could the Plaintiff "police" her right under the Agreement with respect to distribution of sale proceeds. Further, Paragraph 5 provided for both a distribution and a reimbursement of funds pursuant to a formula.  Consequently, the Debtor was obligated to provide an accounting to the Plaintiff in order for distribution to occur as the parties had agreed.

The court is persuaded that the Debtor informed the Plaintiff of his intent to sell the Property. The court is not persuaded, however, that the Debtor disclosed any further information to the Plaintiff in respect of a sale closing. The court concludes, therefore, that the Debtor concealed material facts from the Plaintiff on which the Agreement depended, which facts he had a duty to disclose. Such concealment was intentional and undertaken with a view towards giving the Debtor unfettered control at the sale closing to the Plaintiff's detriment.

The court finds the Debtor's testimony that he kept the Plaintiff in the loop with respect to the Listing Agreement and offers therefrom to be incredible. Rather, the evidence supports a finding that the Debtor did not disclose to the Plaintiff that he had obtained a buyer for the Property, did not disclose the purchase price for the Property, did not disclose in advance the closing date of the sale, never attempted to follow the Profit Sharing Arrangement with respect to the sale closing and never provided the Plaintiff with an accounting of sale proceeds distributions. The Debtor offers no persuasive explanation for the foregoing.

Further evidence of the Debtor's intent to conceal the closing was his decision to utilize Attorney Castronovo (and not Attorney Cusanelli) as his closing attorney. Through Attorney Castronovo's lack of knowledge of the Profit Sharing Arrangement, the Debtor was able to retain all of the net sales proceeds that appeared on the HUD Statement. As noted, Attorney Castronovo testified that she would have escrowed such net proceeds had she been aware of the Profit Sharing Arrangement (which she was not). Moreover, because the Debtor concealed the sale from the Plaintiff and the Profit Sharing Arrangement from Attorney Castronovo, he was able to instruct the unwitting Attorney Castronovo to pay off certain other loans taken out by the Debtor and to satisfy

unauthorized and/or invalid liens against the Property from the sale proceeds. The court is persuaded that such a result is exactly what the Debtor intended to achieve.

Due to the surrounding circumstances, the Debtor relied on the Plaintiff to notify her in advance of any sale in order for her to "police" the distribution process. If the Plaintiff should have received sale proceeds pursuant to the Agreement but did not (*see* Part IV.A, below), that resulted in a debt from the Debtor which the court concludes was not discharged pursuant to Section 523(a)(2)(A) as resulting from a "false representation." Moreover, under the circumstances here the court finds and/or concludes that the Debtor's course of conduct with respect to the sale also constituted "actual fraud" and that any such debt owed by the Debtor to the Plaintiff as a result of his handling of the sale closing was not discharged under Section 523(a)(2)(A) on those grounds as well.

**B.**    **Section 523(a)(6)**

Bankruptcy Code § 523 states in relevant part as follows:

> (a)    A discharge under section 727. . . of this title does not discharge an individual debtor from any debt —
>
> . . .
>
>     (6) for willful and malicious injury by the debtor to another entity or to the property of another entity . . . .

11 U.S.C.A. § 523(a)(6) (West 2011). It is unnecessary for the court to adjudicate the Plaintiff's Section 523(a)(6) claim because it is duplicative of the Plaintiff's Section 523(a)(2)(A) claim.

IV.   **ANALYSIS (DAMAGES)**

    A.   **Measure of Plaintiff's Damages**

        1.   **Burden of Proof**

The court concludes that the Debtor bears the burden of accounting for sale proceeds under the enhanced burden of proof applicable to a fiduciary. What constitutes a fiduciary relationship under Connecticut law is a separate issue from what constitutes a "fiduciary" within the purview of Section 523(a)(4) of the Bankruptcy Code. *May v. Lyon (In re Lyon)*, 348 B.R. 9, 22-24 (Bankr. D. Conn. 2006). Under Connecticut law a fiduciary relationship may be "implied in law due to the factual situations surrounding the transactions and relationships of the parties to each other and to the questioned transactions." *Taylor v. Mitchell College*, No. 561822, 2002 WL 31758412, at *3 (Conn. Super. Ct. Nov. 15, 2002). "In the seminal cases in which [the Connecticut Supreme Court] has recognized the existence of a fiduciary relationship, the fiduciary was either in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 38 (2000).

> In certain instances where it is alleged that a fiduciary has breached his duty, the burden of proof shifts such that the fiduciary has the burden of proving fair dealing by clear and convincing evidence. *Murphy v. Wakelee*, 247 Conn. 396, 400, 721 A.2d 1181 (1998). Such burden shifting occurs in cases involving claims of fraud, self-dealing or conflict of interest. *Id.*

*Satti v. Kozek*, 58 Conn. App. 768, 771, *cert. denied*, 254 Conn. 928 (2000). *See also Roberts v. Weiner*, 137 Conn. 668, 674 (1951). *Cf.* 1 Am. Jur. 2d *Accounts and Accounting* § 66 (2011) ("Although the burden is ordinarily upon the party seeking an accounting to produce the evidence to sustain the accounting, when another person is in control of the books and has managed the business, that other person is in the position of a trustee and must make a proper accounting.").

Under the circumstances here, the court finds and/or concludes that the Debtor was the

Plaintiff's fiduciary and, as found and/or concluded above, committed fraud. Accordingly, the

Debtor bears the enhanced burden of proof, not on the issue of dischargeability (which is governed

by the preponderance of the evidence standard), but, rather, on the issue of damages.

### 2.      "Reimburs[able] Expenses and the Premium

The measure of damages here is the amount the Plaintiff should have received from the sale.

The sale produced $1,217,511.69 in gross cash proceeds:

|   | | |
|---|---|---|
| | $1,223,636.69 | Gross Cash Due Seller |
| − | $      6,125.00 | Cash Adjustment Due Buyer |
| | $1,217,511.69 | Cash Received |

(*See* Plaintiff's Exh. U.) From those proceeds, there are deductions for unchallenged "settlement

charges" in the amount of $72,973.29. (*See id.*) Further, from the sale proceeds, it is undisputed that

there should be a deduction in the amount of $838,785.79 to pay off the Countrywide First Mortgage.

(*See id.*) There also should be a deduction to reflect the payoff of the Countrywide Second Mortgage

($158,691.28 less $49,000.00, *see* n.25 *supra*). None of the other loans (including the Polverari

Loan and the Patriot Mortgage) were *authorized* encumbrances on the Property. Accordingly, no

deductions from sale proceeds were authorized for them as loan repayments. Accordingly, the base

from which the Debtor would be "reimbursed" for expenses is $196,061.33 (the "Base"):

|   | | |
|---|---|---|
| | $1,217,511.69 | Cash Received |
| − | $1,021,450.36 | Payoff of Authorized Mortgages (less $49,000.00 deduction) and "Settlement Charges" |
| | $  196,061.33 | The Base |

Pursuant to the Agreement, the Debtor was entitled to be "reimbursed" for expenses.

"Reimburse[ment]" implies that the Debtor paid the expenses from his own pocket. If an expense

was funded from the Initial Payment, the Debtor funded the expense from the Plaintiff's pocket, not from his own pocket, and is not entitled to be reimbursed therefor.  If an expense was funded from an *authorized* encumbrance on the Property, the Debtor funded that expense from the Property, not from his own pocket, and is not entitled to reimbursement therefor.  However, to the extent that the expenses were *not* funded from either the Initial Payment or an *authorized encumbrance on the Property*, under the Agreement (and if otherwise reimbursable) the Debtor would be entitled to "reimburse[ment]" therefor.  (*See* Paragraph 5.)  The Premium would be calculated on the total of "reimburse[able]" expenses only.  Pursuant to the Agreement, the Plaintiff would be entitled to the amount of the Base remaining after "reimburse[ment]" and payment of the Premium. That remaining amount (if any) would constitute the measure of the Plaintiff's damages.

Based upon the burden of proof analysis set forth in Part IV.A.1 hereof, the Debtor bears the burden to establish (by clear and convincing evidence) lawful deductions (if any) from the Base in accordance with the "reimburs[ability]" analysis set forth herein.

### B.    Collateral Source in Respect of Offsetting Damages

At Trial, counsel for the Debtor raised an issue as to whether the Plaintiff was seeking to be compensated twice for the damages alleged herein.  (*See* Tr. 3 at 134 (remarks of Debtor's counsel).)  The Plaintiff testified that she sued her former attorney (the preparer of the Agreement) and the lawsuit was settled.  However, she could not disclose the settlement amount due to a confidentiality agreement.  (*See id.* at 137 (testimony of the Plaintiff).)  The court indicated that it was left to the parties to argue the relevance of the foregoing.  In his brief, counsel for Debtor addressed the point to some extent and argued that any damages awarded to the Plaintiff here should be reduced by the amount of the settlement received from her former attorney.  (*See* ECF No. 42 at 12.)

- 45 -

Because counsel for the Debtor failed to compel the Plaintiff to disclose the terms of such

settlement, the Debtor has waived the argument on the foregoing point.  Moreover, the issue of

settlement proceeds is irrelevant.  Connecticut common law has a "collateral source" rule under

which a defendant is not entitled to benefit from recoveries of the subject type.  *See Zhuta v. Zhuta*,

No. CV0440182768S, 2007 WL 2363387, at *2 (Conn. Super. Ct. July 27, 2007) ("Our common

law principle is that a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be

diminished because of benefits received by the plaintiff from independent sources.").  *Cf. Pacific*

*Gas & Electric Co. v. Superior Court*, 219 Cal. App. 2d 817 (1963), *appeal dismissed and cert.*

*denied*, 377 U.S. 215, *reh'g denied*, 379 U.S. 872 (1964) (finding that common law "collateral

source" rule applied so as to preclude reduction of any damages award to plaintiff utility company

by amount received by utility company in settlement from insurer respecting subject fraud).

Section 52-225a(a) of the Connecticut General Statutes[39] abrogates the common law

"collateral source" rule in certain circumstances.  *See Jones v. Kramer, supra*.  However, Section

52-225a(a) applies only in personal injury and wrongful death cases (*see* Conn. Gen. Stat. § 52-

225a(a)), which is not the case here.  Moreover, even if Section 52-225a(a) were to apply here, that

---

[39]        The statute provides in pertinent part as follows:

In any civil action, whether in tort or in contract, wherein the claimant seeks to
recover damages resulting from . . . personal injury or wrongful death . . . , and
wherein liability is . . . determined by the trier of fact and damages are awarded to
compensate the claimant, the court shall reduce the amount of such award which
represents economic damages . . . .

Conn. Gen. Stat. Ann. § 52-225a(a) (West 2011).  *See also Jones v. Kramer*, 267 Conn. 336, 338-39
(2004) ("In a personal injury action, General Statutes § 52-225a authorizes the trial court to reduce
the plaintiff's economic damages award by an amount equal to the sum of collateral source payments
received by the plaintiff, less any amount paid by or on behalf of the plaintiff to secure those
payments." (footnote omitted)).

statute specifically does not provide for a deduction from damages for settlement proceeds. *See* Conn. Gen. Stat. Ann. § 52-225b (West 2011) ("'collateral sources' do not include amounts received by a claimant as a settlement.").

For the reasons set forth above, the court concludes that the Debtor is not entitled to a credit for the subject settlement proceeds.

## V.    <u>CONCLUSION</u>

For the reasons set forth above, the court concludes that, as to the Initial Payment, any such debt was discharged. However, to the extent that any amount was due the Plaintiff under the Agreement from the Debtor's sale of the Property, that amount constitutes a debt that was not discharged pursuant to Section 523(a)(2)(A).

Although the Debtor has addressed the amount of expenses he claims as deductions from the Base, he has not addressed the issue of "reimburs[ability]" discussed above. Having highlighted the issue herein (and having clarified the burden of proof), the court deems it appropriate to afford the Debtor a final opportunity to satisfy his burden of proof on the "reimburs[ability]" issue. A separate order will issue scheduling a status conference to discuss appropriate "next steps" in this adversary proceeding.

**IT IS SO ORDERED.**

Dated: January 4, 2012                                    BY THE COURT

**Lorraine Murphy Weil**
**Chief United States Bankruptcy Judge**